IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MHF OPCO, LLC,

                              Plaintiff,

    v.                                                                    OPINION AND ORDER

RYAN CHARLES DREXLER,                                    22-cv-707-wmc

                              Defendant.

---

Plaintiff MHF Opco, LLC, claims that defendant Ryan Charles Drexler owes it over $3 million under the terms of his personal guaranty on the debts of MusclePharm Corporation. (Dkt. #18.) Plaintiff seeks to enforce the personal guaranty executed by defendant and has filed motion for summary judgment on its claim for the amount owed, plus interest and attorney's fees. (Dkt. #54.) Defendant, who disputes that plaintiff has standing to enforce the personal guaranty and, alternatively, denies that he signed it, has filed a motion for partial summary judgment to exclude interest and attorney's fees from the amount sought by plaintiff. (Dkt. #60.) For the reasons set forth below, plaintiff's motion for summary judgment will be granted and defendant's motion will be denied.

UNDISPUTED FACTS[1]

In June 2022, MHF Opco, LLC ("Opco"), which is a Texas-based limited liability company, acquired all assets, debts, and other obligations owned by Mill Haven Foods ("Mill Haven"), a Wisconsin-based food products company.  Prior to the acquisition, Mill Haven had sold a substantial quantity of dry dairy protein powder -- for which it had not been paid -- to MusclePharm Corporation ("MusclePharm"), a Nevada-based manufacturer of sports nutrition products and nutritional supplements.  (Dkt. #1, ¶ 1.)  In addition to owning more than 50% of MusclePharm, Drexler claims to have himself loaned between $10 and 50 million to that corporation.

Before Mill Haven began doing business with MusclePharm, Mill Haven Chief Executive Officer Brian Slater flew to its office in Burbank, California, to meet with Drexler, who was then MusclePharm's Chairman of the Board and Chief Executive Officer.  During that meeting, which occurred in 2019, Slater expressed reservations about MusclePharm's ability to pay for product in light of the volume Drexler was seeking to purchase and concerns with the company's finances.  Specifically, Slater knew from discussions with other suppliers in the industry and MusclePharm representatives, as well

---

[1] Unless otherwise noted, the following facts are drawn from the parties' proposed findings of fact and are viewed in the light most favorable to defendant Drexler.  *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025).  However, to the extent that defendant has not disputed facts proposed by plaintiff in a manner consistent with Fed. R. Civ. P. 56(c) and the court's procedures on summary judgment, the court treats those facts as undisputed.  Preliminary Pretrial Packet (dkt. #48) Summary Judgment Procedures, §§ I(C), II(C)-(E); *see also Allen-Noll v. Madison Area Tech. College*, 969 F.3d 343, 348 (7th Cir. 2020) (District courts may require exact compliance with their local rules, including local rules governing summary judgment.).

as reviewing Securities and Exchange Commission 10-Ks and other sources, that MusclePharm was having difficulty paying its debts.  Slater also knew that MusclePharm's accounts receivables would accrue quickly given the large volume of product Drexler was seeking.

As CEO of Mill Haven, therefore, Slater refused to enter into an agreement to sell protein powder to MusclePharm in large quantities unless Drexler provided a personal guaranty.  Slater also communicated this to Drexler and MusclePharm Chief Operating Officer Alberto Andrade.  More specifically, Slater explained to them that he would not enter into an agreement to sell protein powder to MusclePharm in significant volumes at favorable prices unless he was provided some form of collateral.  Accordingly, on August 19, 2019, Slater emailed Andrade requesting a personal guaranty from Drexler.  Andrade responded by email the following day, instructing Slater to send him a document with the requested language.  Next, Mill Haven Chief Operating Officer Larry Erbs emailed Andrade with a copy of the personal guaranty that Slater discussed having Drexler sign.  After Erbs and Andrade then traded emails on September 3, 2019, Erbs again emailed Andrade a copy of the personal guaranty for Drexler's signature, along with an Agreement providing Terms and Conditions of Sale (the "Sales Agreement") between Mill Haven as seller and MusclePharm as buyer.

On September 4, 2019, MusclePharm Senior Supply Chain Manager Aaron Hackel further emailed Slater a purchase order for protein powder at a price that Andrade had negotiated with Slater.  That same day, Slater responded that he would still need the personal guaranty from Drexler before filling the order.  On September 6, 2019, Andrade

3

emailed Slater, advising him that he was "wrapping up PG as we speak with the lawyers." Slater understood "PG" to mean Drexler's personal guaranty. Finally, on September 6, Andrade went into Drexler's office to have him sign the personal guaranty. Andrade watched Drexler sign the personal guaranty, then took the document back to his office, where he scanned it and emailed it to Slater, along with the Sales Agreement between Mill Haven and MusclePharm.

A copy of the personal guaranty bearing Drexler's signature (the "Personal Guaranty" or "Guaranty") is attached to Opco's amended complaint as part of the Sales Agreement between Mill Haven and MusclePharm. (Dkt. #18-2.) Under its express terms, Drexler, as "Guarantor," unconditionally guaranteed payment of the purchase price or "Guaranteed Amounts" for "Deliverables," defined as products sold by Mill Haven to MusclePharm in accordance with the attached Sales Agreement, along with interest "added to all amounts outstanding more than thirty (30) days after the invoice date at the rate of 1.5% per month or the maximum rate of interest allowed by applicable law, whichever is lower." (*Id*. at 6, 7.) In addition, the Personal Guaranty calls for payment of attorney's fees, which "absolutely and unconditionally guarantees Mill Haven . . . payment, on demand by Mill Haven, of all reasonable legal and other costs, expenses and fees at any time paid or incurred by Mill Haven in endeavoring to enforce any right under . . . this Guaranty." (*Id*.) The Personal Guaranty further explains that it "is a continuing guaranty and shall remain in full force and effect so long as MusclePharm owes Mill Haven, or its assigns, any purchase price for Deliverables[.]" (*Id*.) The Personal Guaranty also emphasizes, in bold and all capital letters, as follows: **THIS IS AN AGREEMENT TO**

4

**GUARANTY THE PAYMENT OF A DEBT OF ANOTHER**." (*Id*. at 9 (emphasis in original).)

After September 6, 2019, whenever MusclePharm wished to purchase product from Mill Haven, it would complete and tender a purchase order. Upon receipt of MusclePharm's purchase order, Mill Haven would then generate a "sales contract" that described the commodity, quantity, pricing information, pickup information, shipment method, and payment terms. Each such sales contract would also expressly incorporate the Sales Agreement between Mill Haven and MusclePharm. Still, on multiple occasions, Slater refused to ship product that MusclePharm had ordered from Mill Haven because MusclePharm was not paying in full when due. Slater contends that in several such instances Drexler would then call to ask him to release additional product to MusclePharm, emphasizing that since he had signed the Personal Guaranty, Mill Haven would be made whole if MusclePharm did not pay.

Between December 2021 and June 2022, Mill Haven proceeded to sell and deliver more than $3 million in dry dairy powders to MusclePharm as confirmed by contemporaneous recordkeeping.[2] In June 2022, Opco acquired all of Mill Haven's assets, debts, and other obligations under the terms of an Asset Purchase and Contribution Agreement ("APA"), which defines "Mill Haven Assets" to include "all Accounts

---

[2] Copies of MusclePharm's purchase orders, unpaid sales contracts and invoices are attached to the amended complaint. (Dkt. #18-3, #18-4, #18-5.)

Receivable." (Slater Decl. Ex. 1 APA (dkt. #56-1) 23-24.) Further, "Accounts Receivable" is defined in the APA to include:

> (i) all trade accounts receivable and other **rights to payment from customers** and **the full benefit of all security** for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers, (ii) all other accounts or notes receivable and **the full benefit of all security** for such accounts or notes, and (iii) **any claim, remedy or other right relating to any of the foregoing**.

(*Id*.)(emphasis added). Opco also acquired from Mill Haven "all rights to any Actions of any nature . . . whether arising by way of counterclaim or otherwise." (*Id*.) The APA defines an "Action" to include "any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, regardless of whether civil, criminal, administrative, regulatory or otherwise, at law or in equity, formal or informal, or public or private." (*Id*.) As part of the acquisition, Mill Haven's CEO Slater also became CEO of Opco. (Slater Decl. (dkt. #56) ¶ 3.)

As of November 29, 2022, Mill Haven's "Aged Receivables" included over $3 million for product that had been sold and delivered to MusclePharm. On December 13, 2022, Opco filed this lawsuit against both MusclePharm and Drexler as its Guarantor, asserting claims for breach of contract and unjust enrichment. (Dkt. #1, at 9-13 ¶¶ 53-84.) Opco sought actual damages on behalf of Mill Haven in an amount greater than $3 million, jointly and severally from both defendants, in addition to interest and costs of suit, including attorney's fees. (*Id*. at 13.) Two days later MusclePharm filed a petition for relief under Chapter 11 of the Bankruptcy Code in Case No. 22-14422-nmc in the

United States Bankruptcy Court for the District of Nevada.[3]  (Dkt. #7.)  Subsequently, Opco filed an amended complaint, dropping MusclePharm as a defendant due to its bankruptcy, which remains pending, while continuing to maintain its claims against Drexler under the term of his Personal Guaranty.  (Dkt. #18.)

OPINION

Plaintiff seeks summary judgment on its claim against defendant Drexler for breach of his Personal Guaranty to pay MusclePharm's debt for product sold and delivered by Mill Haven.  Specifically, plaintiff seeks the amount of $3,374.521.75 for the cost of products that defendant failed to pay for, plus $2,260.123.73 in interest under the terms of the contract,[4] for a total of $5,634,6456.48, plus reasonable attorney fees and costs of suit.  (Dkt. #66, at 20; Vanden Heuvel Decl. (dkt. #58) ¶¶ 7-11.)  In opposition, defendant argues that plaintiff lacks standing to enforce the Personal Guaranty for payment of product sold by Mill Haven and, despite overwhelming evidence to the contrary, denies that he signed it.  Assuming that he is liable, defendant also cross-moves for partial summary judgment as to the actual amount he owes, arguing that the damages recoverable under the Personal Guaranty do not include interest, attorney's fees or other costs despite its express terms to the contrary.

---

[3] The bankruptcy case involving MusclePharm remains pending at this time.

[4] The amount of interest was calculated as of February 17, 2025.  (Dkt. #66, at 20; Vanden Heuvel Decl. (dkt. #58) ¶ 4.)

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, as the Seventh Circuit has frequently observed, summary judgment is a "put up or shut up" moment for the parties in suit. *Ellison v. United States Postal Svc.*, 84 F.4th 750, 759 (7th Cir. 2023). In particular, once a party has proffered a properly supported motion for summary judgment, the nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to [reach] a verdict in [his] favor." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (citation and internal quotation marks omitted). More specifically, to survive summary judgment, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Thus, the mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there must be evidence on which the jury could reasonably find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

While the court views the evidence "in the light most favorable to the nonmovant and constru[es] all reasonable inferences from the evidence in his favor," *Moore v. Western Ill. Corr. Ctr.*, 89 F.4th 582, 590 (7th Cir. 2023), a nonmovant is only entitled to reasonable inferences that are supported by admissible evidence, not by mere speculation or conjecture. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). Similarly, facts need only be taken in the light most favorable to the nonmoving party where there is

a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*.

## I.    Plaintiff's Breach of Contract Claim

The parties agree that Wisconsin law applies to the contract at issue -- here, the Personal Guaranty that Slater required defendant Drexler to sign before Mill Haven would sell any of its products to MusclePharm. To prove breach of contract, plaintiff must show (1) the existence of a contract between the plaintiff and the defendant; (2) breach of that contract; and (3) damages. *Pines Bach, LLP v. Mills*, No. 22-cv-66-jdp, 2023 WL 6847118, at *2 (W.D. Wis. Oct. 17, 2023) (citing *Pagoudis v. Keidl*, 2023 WI 27, ¶ 12, 406 Wis. 2d 542, 554, 988 N.W.2d 606, 612).

At summary judgment, plaintiff has submitted uncontested evidence that Mill Haven sold large quantities of dry dairy powder to MusclePharm contingent upon defendant Drexler first executing a Personal Guaranty for payment of those products. (Slater Decl. (dkt. #56) ¶¶ 23-24; Andrade Dep. (dkt. #53) 23:24–24:14.) Further, under the express terms of the Personal Guaranty, which bears his signature, defendant agreed to pay Mill Haven for all products delivered to MusclePharm, including interest, legal fees and costs incurred in enforcing the guaranty. (Dkt. #18-2, at 7-9.) Moreover, the Personal Guaranty remains in effect so long as MusclePharm owes Mill Haven "*or its assigns*" any unpaid amount, which "shall inure to the benefit of Mill Haven and its successors and assigns." (*Id*. at 7 (emphasis added).) Further, since all of Mill Haven's Accounts

9

Receivables were legally assigned to plaintiff Opco under the terms of the APA as part of the June 2022 acquisition, along with the right to pursue collection by any legal action, plaintiff proffers additional, undisputed evidence establishing damages due to defendant's breach of contract in the amount of $3,374,521.75 for the cost of goods that MusclePharm has failed to pay, plus $2,260,123.73 in pre-judgment interest as of February 17, 2025, as well as reasonable attorney fees and costs in suit as yet to be determined.  (Slater Decl. (dkt. #56) ¶ 39; Vanden Heuvel Decl. (dkt. #58) ¶¶ 7-11.)

In turn, defendant does not (and cannot) dispute that he has failed to honor the Personal Guaranty and, therefore, is in breach of that contract.  Rather, defendant argues that plaintiff's contract claim fails because plaintiff did not acquire Mill Haven's right to enforce the Personal Guaranty upon acquiring Mill Haven's assets in June 2022, and even if it did, he now denies signing it.  Both arguments fail at summary judgment for reasons discussed below.

### A.  Opco's Acquisition of Mill Haven's Assets

As for defendant's assertions that the Personal Guaranty was not assigned to plaintiff Opco in acquiring Mill Haven's assets in June 2022 or that plaintiff lacks standing to enforce it, the express terms of plaintiff's APA states otherwise.  Nevertheless, in support, defendant notes that Section 2.01 of the APA lists "Assigned Contracts" and "Excluded Contracts" included in the acquisition of Mill Haven's assets.  "Contracts" are broadly defined in Section 1.01 of the APA to include, *inter alia*, leases, deeds, mortgages, and other "agreements, commitments and legally binding instruments, whether written or oral." (Slater Decl. Ex. 1 APA (dkt. #56-1) 11.)  Because the Personal Guaranty is not among

10

the 64 Assigned Contracts acquired by plaintiff from Mill Haven, defendant reasons that it is an "Excluded Contract" that confers no rights on plaintiff.

Why this should be so is far from clear. Regardless, as plaintiff points out, the Personal Guaranty also expressly secures payment for goods sold and delivered by Mill Haven to MusclePharm under the Sales Agreement, which falls squarely and unambiguously under the APA's definition of "Mill Haven Assets" as set forth above, including "all Accounts Receivable." (Slater Decl. Ex. 1 APA (dkt. #56-1) 23.) As also noted above, "Accounts Receivable" is defined in the APA to include all "trade accounts receivable and other rights to payment from customers and the full benefit of all security for such accounts or rights to payment . . . [for] goods shipped or products sold . . . to customers[.]" (*Id*. at 8.) That definition further extends to "the full benefit of all security for such accounts or notes" and "any claim, remedy or other right relating to the foregoing." (*Id*.) Therefore, plaintiff argues that the terms of the APA clearly and unambiguously assigned defendant's obligation to make good on Account Receivables under Mill Haven's Personal Guaranty as an asset.

To begin, the construction of a contract is a question of law in Wisconsin. *Elkhart Lake's Road Amer. Inc. v. Chicago Hist. Races, Ltd*., 158 F.3d 970, 972 (7th Cir. 1998). The primary purpose of that construction is to determine and give effect to the parties' intentions as expressed in the contractual language. *Seitzinger v. Community Health Network*, 2004 WI 28, ¶ 22, 270 Wis. 2d 1, 676 N.W.2d 426. Language in a business contract in particular is construed in the manner in which it would be understood "by persons in the business to which the contract relates." *Ash Park, LLC v. Alexander & Bishop, Ltd*., 2015

11

WI 65, ¶ 37, 363 Wis. 2d 699, 866 N.W.2d 679.  Interpretations that give reasonable meaning to each provision in the contract are preferred over interpretations that render a portion of the contract superfluous.  *Id*.  And the court is required to interpret the contract in a way that avoids absurd results.  *Foskett v. Great Wolf Resorts, Inc*., 518 F.3d 518, 525 (7th Cir. 2008) (citing *Kaehes v. Sch. Dist. of River Falls*, 2004 WI App 55, ¶ 11, 270 Wis. 2d 502, 677 N.W.2d 667).

Moreover, "[w]here the terms of a contract are clear and unambiguous, [Wisconsin courts] construe the contract according to its literal terms."  *Tufail v. Midwest Hosp., LLC*, 2013 WI 62, ¶ 26, 348 Wis. 2d 631, 833 N.W.2d 586.  This is so because courts are to "presume the parties' intent is evidenced by the words they chose, if those words are unambiguous."  *Id*.  Whether the contract's language is "ambiguous" is also a question of law in Wisconsin, meaning that the court must determine if the terms of the contract "are reasonably or fairly susceptible of more than one construction."  *Borchardt v. Wilk*, 156 Wis. 2d 420, 427, 456 N.W.2d 653 (1990).  "If the terms of the contract are ambiguous, evidence extrinsic to the contract itself may be used to determine the parties' intent."  *Tufail*, 2013 WI 62, ¶ 27.

Although defendant attempts to question whether the parties intended to assign the Personal Guaranty for payment of MusclePharm's substantial debt to plaintiff under the terms of the APA, his arguments are not persuasive and there is nothing unambiguous about the contractual language, nor about the fact that defendant's obligation to pay a debt had ripened and was outstanding well before the APA was even executed.  "Contracts are generally assignable as long as the assignment does not materially change the duties or

risks of the debtor, and as long as assignment is not prohibited by statute, public policy, or language within the contract itself." *Clearpointe Capital, Inc. v. Townsend*, 2004 WI App 149, ¶ 8, 275 Wis. 2d 878, 685 N.W.2d 172 (citing *J.G. Wentworth S.S.C. Ltd. P'Ship v. Callahan*, 2002 WI App 183, ¶ 9, 256 Wis.2d 807, 649 N.W.2d 694); *see also* Anthony S. Baish, et al., *II Contract Law in Wisconsin* § 9.5 (6th ed. 2025) ("As a general proposition, the modern common law holds that contractual rights can be assigned."). For this reason, formal language is not essential to create a valid assignment. *Riegleman v. Krieg*, 2004 WI App 85, ¶ 34, 271 Wis. 2d 798, 679 N.W.2d 857.

Here, the court has little trouble concluding that plaintiff Opco and Mill Haven, as the parties to the APA, assigned outstanding debts like those owed by defendant under the Personal Guaranty. First, the Guarantee is at minimum properly deemed a "security" or "right to payment" held by Mill Haven for products sold to a customer (MusclePharm), and duly assigned to plaintiff under the specific definition of Accounts Receivable as a "claim, remedy, or right" relating to security for those products. Mill Haven's claim in this lawsuit against defendant Drexler for breach of that Personal Guaranty likewise qualifies as an "Action" that was also assigned to plaintiff as a Mill Haven Assets under the APA. Not only does the assignment of this debt not materially change the duties or risks of plaintiff, but any other interpretation would be absurd on its face as between Mill Haven and Opco. *Foskett*, 518 F.3d at 525. Because the terms of the APA are unambiguous, defendant has failed to establish as a matter of law that plaintiff was not assigned Mill

Haven's rights under the Personal Guaranty or that it lacks standing to enforce the Personal Guaranty as one of the Mill Haven Assets acquired.[5]

### B. Defendant's Signature

Defendant also testified at his deposition in January 2025 that he did not sign the Personal Guaranty and had "no insight" as to who did.  (Drexler Dep. (dkt. #52) 95:25–96:1, 97:6-8.)  Defendant then submitted a declaration, again denying under penalty of perjury that his signature was not on the document.  (Drexler Decl. Feb. 4, 2025 (dkt. #82) ¶ 6.)

Plaintiff argues that defendant's self-serving, later denial is contradicted by overwhelming evidence in the record, showing that Slater negotiated the Personal Guaranty *with Drexler and Andrade* at arm's length. (Slater Decl. (dkt. #56) 24; Andrade Dep. (dkt. #53) 26:23–27:11.)  Indeed, even defendant does not dispute that Mill Haven's CEO Slater *insisted* upon defendant signing the Personal Guaranty *as a condition* of its doing business with MusclePharm, as attested to by both Slater and Andrade.  (Slater Decl. (dkt. #56) ¶¶ 23-24; Andrade Dep. (dkt. #53) 23:24–24:14.)  Andrade also testified he *witnessed* defendant putting pen to paper and signing the Personal Guaranty at MusclePharm's Burbank office in the presence of two other members of MusclePharm's board of directors.  (Andrade Dep. (dkt. #53) 26:23–29:17.)  Andrade then returned it to Slater, along with

---

[5] To the extent that the APA could be considered ambiguous, plaintiff has also provided declarations from executives on both sides of the APA transaction who attest that they understood and intended that the APA assign the breach-of-contract claim against Drexler from Mill Haven to Opco.  (Slater Decl. (dkt. #56) ¶ 17; Redmond Decl. (dkt. #59) ¶ 11.)

the Sales Agreement for Mill Haven products. (*Id*. at 28:5-7.) Moreover, after receiving defendant's Personal Guaranty, Mill Haven sold and delivered a substantial amount of product to MusclePharm. (Dkt. #18-5.) Fourth, plaintiff presents additional documentation in the form of email correspondence from Slater to defendant when MusclePharm fell into arrears, referencing the Personal Guaranty without contradiction. (Slater Decl. Ex. 11 Email dated Sept. 21, 2021 (dkt. #56-11) 2; Slater Decl. Ex. 12 Emails dated Oct. 5 and Oct. 7 (dkt. #56-12) 2-3.)

Although defendant now disputes that he spoke to Slater about the Personal Guaranty (or knew anything about it), plaintiff contends the late denials at his deposition testimony and in a subsequent declaration do not raise a genuine fact issue for several reasons. Principally, plaintiff argues that defendant has made judicial admissions that overcome his more recent claim not to have signed his Personal Guaranty. "Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them." *Keller v. United States*, 58 F.3d 1194, 1198 n. 8 (7th Cir. 1995). In addition to statements in a party's pleadings, "[a]ny 'deliberate, clear and unequivocal' statement, either written or oral, made in the course of judicial proceedings qualifies as a judicial admission." *In re Lefkas Gen. Partners No. 1017*, 153 B.R. 804, 807 (N.D. Ill. 1993) (quoting *Matter of Corland Corp*., 967 F.2d 1069, 1074 (5th Cir. 1992)); *see also McCaskill v. SCI Mgmt. Corp*., 298 F.3d 677, 680 (7th Cir. 2002) (quoting *Lefkas*). "A judicial admission is conclusive, unless the court allows it to be withdrawn; ordinary evidentiary admissions, in contrast, may be controverted or explained by the

15

party." *Keller*, 58 F.3d at 1198 n. 8 (quoting John William Strong, *McCormick on Evidence* § 254 at 142 (1992)).

Plaintiff argues that defendant's recent denials are inconsistent with his material admissions and omissions previously in this lawsuit.  Specifically, in a declaration filed shortly after this lawsuit was filed, defendant did not deny signing the Personal Guaranty, asserting instead that he "[did] not recall" signing it.  (Drexler Decl. March 8, 2023 (dkt. #21) ¶ 4.)  Similarly, in his formal answer to plaintiff's complaint, defendant did not expressly deny that he signed the Personal Guaranty, stating that he "lack[ed] knowledge or information sufficient to form a belief" as to the whether he signed it.  (Dkt. #23, ¶¶ 28, 60.)  Further, in response to an interrogatory request, defendant again stated that he lacked information -- such as "expert analysis" -- from which to confirm or deny whether he signed it.  (Hollander Decl. Ex. 6 (dkt. #55-6) Response to Interrogatory No. 7.)

Generally speaking, the Seventh Circuit does not permit a party who has asserted a lack of recollection or disclaimed knowledge of a certain subject to create an issue of fact with a subsequent, contradictory statement, at least without some satisfactory explanation for such a self-serving reversal.  *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292-93 (7th Cir. 1996); *Unterreiner v. Volkswagen of Amer., Inc.*, 8 F.3d 1206, 1211 (7th Cir. 1993).  Even statements that are not directly contradictory may be excluded under this rule.  *Hickey v. Protective Life Corp.*, 988 F.3d 380, 389-90 (7th Cir. 2021).  Because defendant's unequivocal, repeated denials of having signed his Personal Guaranty contradicts his previous statements based on a lack of recollection, those denials cannot be used to manufacture a factual dispute.  Indeed, as plaintiff argues, defendant's professed certainty

16

in later deposition testimony and subsequent declaration after previously professing a lack of recollection or knowledge, may also be disregarded under the "sham-affidavit" rule, which authorizes a judge to disregard an affidavit that attempts to create a factual issue capable of defeating summary judgment by contradicting the same affiant's prior sworn statements. *James v. Hale*, 959 F.3d 307, 316-17 (7th Cir. 2020). Courts have further extended this rule's application to contradictory statements made in a so-called "sham-deposition." *Woods v. Fermaint*, No. 10 C 3853, 2012 WL 3581177, at *4 (N.D. Ill. Aug. 17, 2012); *see also Israel v. John Crane, Inc.*, 601 F. Supp. 3d 1259, 1271 (M.D. Fla. 2022) (disregarding portions of the plaintiff's deposition testimony that contradicted his interrogatory response and concluding further that the remaining deposition testimony was insufficient to avoid summary judgment) (citations omitted).

While these rules precluding abandonment of previous positions held in formal pleadings or sworn affidavits or testimony are not to be applied lightly, their application is nevertheless appropriate "to weed out unfounded claims, specious denials, and sham defenses," and particularly to prevent parties from conjuring up a factual dispute "out of nothing" to thwart summary judgment. *James*, 959 F.3d at 316 (citation and internal quotation omitted). Moreover, to the extent that defendant stated previously in his interrogatory response that he needed an expert to confirm whether he signed the Personal Guaranty (since he did not recall doing so), plaintiff is right to point out that defendant has disclosed no such expert. Nor has the defendant mustered any other evidence to support his newly minted claim that the signature on the Personal Guaranty is not his. In fact, since the Personal Guaranty bearing defendant's signature is at the very heart of

plaintiff's breach-of-contract claim, defendant's unexplained recall is, if not wholly suspect at best, implausible, especially given defendant's admitted failure at his deposition to "call anyone" or "do anything" to investigate who could have signed the Personal Guaranty despite more than $3 million in unpaid invoices being at stake. (Drexler Dep. (dkt. #52) 97:2–98:5.) Indeed, defendant has offered no explanation why, at the start of this lawsuit he would have pleaded and professed a lack of recollection or knowledge, only to change course two years later at his deposition, much less adamantly deny signing it.

This leads to plaintiff's final and most compelling argument regarding the contradictory nature of defendant's claim that the signature on the Personal Guaranty is not his: defendant's more recent testimony is simply incredible as a matter of law in light of the undisputed evidence showing that Slater insisted on obtaining defendant's Personal Guaranty as a prerequisite to selling MusclePharm *any* of Mill Haven's goods and Andrade witnessed defendant sign. Alongside the rest of the evidence in the record, which overwhelmingly shows that defendant *did* sign the Personal Guaranty *and* that Mill Haven sold and delivered more than $3 million worth of product in reliance upon it.

"If a party's sworn statements are 'utterly implausible in light of all relevant circumstances,' a court may reject them without a trial." *Whitaker v. Dempsey*, 144 F.4th 908, 917 (7th Cir. 2025) (quoting *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) (affirming summary judgment denying bankruptcy discharge where debtor had defrauded creditors; despite debtor's sworn denial of fraudulent intent, no reasonable person could believe his stated reasons for his false representations and omissions)). Because courts are typically prohibited from weighing evidence or making credibility determinations on

18

summary judgment, *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 150 (2000), the "narrow" exception for utter implausibility is available only in exceptional cases to avoid trespassing on the province of the jury, whose role is to decide genuine fact issues. *Whitaker*, 144 F.4th at 917. However, the Seventh Circuit has suggested that the exception is most applicable in sham affidavit cases or cases in which a party's inconsistent and contradictory statements transcend credibility concerns and go to the heart of whether the party has raised *genuine* issues of material fact for a jury to decide. *Id*.

This is just such a case. Having provided no explanation for his inconsistent statements regarding the Personal Guaranty that Slater had insisted upon, his own company's COO Andrade having witnessed defendant sign, and Mill Haven having refused to ship goods until being provided with defendant's signed Personal Guaranty, Slater and his company had every right to rely on it in selling any products to MusclePharm, much less continue to deliver those products when MusclePharm fell behind on its payments based in substantial part on defendant's assurances of personal liability.

"Courts are not compelled to treat as true an assertion in a party's deposition or affidavit that is plainly false when considered alongside the rest of the record." *Whitaker*, 144 F.4th at 919. Thus, the bare assertion in defendant's deposition or later affidavit is utterly implausible as a matter of law and cannot defeat an otherwise properly supported summary judgment motion. *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 585 (7th Cir. 2021). Because the factual dispute about defendant's signature is not genuine, the court

concludes that plaintiff is entitled to summary judgment on its breach of contract claim and that defendant is liable under the Personal Guaranty.

## II.    Recovery of Interest and Attorney's Fees

Having so ruled, the court must also consider defendant's motion for partial summary judgment, based on his contention that any liability under the Personal Guaranty should be limited solely to the actual purchase price of product sold by Mill Haven to MusclePharm, and not included prejudgment interest or attorney's fees.[6]  As explained above, the Personal Guaranty expressly requires the guarantor (defendant Drexler) to pay the "amounts for Deliverables" that are "due in accordance with the Terms of Conditions" found in the Sales Agreement (*i.e.*, the "purchase price for the Deliverables" or the "Guaranteed Amounts").  (Dkt. #18-2, at 7.)   As incorporated by reference in the Personal Guaranty, the Sales Agreement in turn defines "Deliverables" as the goods sold by Mill Haven to MusclePharm.  (*Id*. at 6.)   That Agreement also states that "[i]nterest will be added to all amounts outstanding more than thirty (30) days after the invoice date at the rate of 1.5% per month or the maximum rate of interest allowed by applicable law."  (*Id*.)

"[R]elated documents are usually read together to ascertain the scope of the parties' agreement."  *Little Chute Area Sch. Dist. v. Wis. Educ. Ass'n Council*, 2017 WI App 11, ¶ 31, 373 Wis. 2d 668, 892 N.W.2d 312 (citation omitted).  Here, there is no material dispute that the Sales Agreement is a document that was executed at the same time and

---

[6] Defendant also repeats his now rejected argument that plaintiff cannot enforce the guaranty because it was not acquired as part of the purchase of Mill Haven's assets.  (Dkt. #61, at 5-6.)

incorporated by reference in the Personal Guaranty. Thus, by agreeing to pay for all Deliverables in accordance with the Sales Agreement, defendant also agreed to pay interest on the outstanding amounts for the applicable goods starting 30 days from the invoice date. (Dkt. #18-2, at 6.) So, too, by signing the Personal Guaranty (or at the very least being bound by it given plaintiffs reasonable reliance on its terms), defendant bound himself to pay MusclePharm's debt if the company could not. (*Id*. at 7 ("**THIS IS AN AGREEMENT TO GUARANTY THE PAYMENT OF A DEBT OF ANOTHER**." (emphasis in original).) Accordingly, any debt owed by MusclePharm for unpaid amounts owed on Mill Haven's Deliverables includes the interest charges required by the Sales Agreement, and defendant is liable for those "Guaranteed Amounts" under the unambiguous terms of the parties' contract.[7]

Finally, there is no dispute that the Personal Guaranty expressly requires the guarantor (defendant Drexler) to pay "all reasonable legal and other costs, expenses and fees" incurred in the enforcement of the Guaranty. (Dkt. #18-2, at 7.) Therefore,

---

[7] While disputing that interest was included in the guaranty, in response to plaintiff's motion for summary judgment, defendant did not dispute the *amount* of interest owed as calculated by plaintiff. (Pl. Reply to Def. Response to PFOF (dkt. #93) ¶ 98.) Defendant argues for the first time in his reply brief on his motion for partial summary judgment that the amount of interest exceeds the maximum allowed by Wisconsin law. (Dkt. #88, at 7.) The court does not address this contention because arguments that are raised or developed for the first time in a reply brief are waived. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) (citing *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019)); *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 968 (7th Cir. 2020). The court will, however, order plaintiff to supplement the record with the amount of interest owed on the unpaid invoices covered by the Personal Guaranty as of the date of this opinion, giving defendant an opportunity to respond to the updated calculation, albeit only as to the calculation itself, and plaintiff an opportunity to reply.

defendant is also on the hook for plaintiff's reasonable attorney's fees and costs associated with this lawsuit under the terms of the Guaranty.  As a result, defendant's motion for partial summary judgment will be denied and both sides will be given an opportunity to address that award as well.

ORDER

IT IS ORDERED that:

1) Plaintiff MHF Opco, LLC's motion for summary judgment (dkt. #54) is GRANTED.

2) Defendant Ryan Charles Drexler's motion for partial summary judgment (dkt. #60) is DENIED.

3) Plaintiff shall supplement the record within 21 days with a proposed judgment that includes an updated calculation of the amount of interest owed by defendant on the unpaid invoices covered by the Personal Guaranty and the attorney's fees being sought, along with any supporting documentation. Defendant shall file any response within 14 days.  Plaintiff shall then have 10 days to file a reply.

4) Within 21 days, plaintiff shall submit its brief and any supporting materials in support of its request for attorneys' fees, including itemized time records, invoices, and proof of payment of such invoices by Opco.  Defendant shall have 14 days thereafter to submit its opposition.  If defendant challenges the reasonableness of plaintiff's fee request in that opposition, its counsel shall also contemporaneously submit its itemized time records, invoices and proof of payment of such invoices.  Plaintiff shall have 10 days thereafter to file a reply, if any.

Entered this 8th day of December, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

22